IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM THOMAS SCHMITZ,<br><br>              Petitioner,<br><br>vs.<br><br>JOE A. LIZARRAGA, Warden, Mule Creek State Prison,<br><br>              Respondent. | No. 2:14-cv-00659-JKS<br><br>MEMORANDUM DECISION |

William Thomas Schmitz, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Schmitz is in the custody of the California Department of Corrections and incarcerated at Mule Creek State Prison. Respondent has answered, and Schmitz has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On November 23, 2005, Schmitz was charged with murder (count 1), possession of methamphetamine for sale (count 2), and possession of marijuana for sale (count 3). The information further alleged as to count 1 that Schmitz personally and intentionally discharged a firearm. Schmitz pled not guilty to all counts and denied the enhancement. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Schmitz:

> In May 2005, [Schmitz] and his on-again, off-again girlfriend, Jennifer, went to a friend's birthday party. The victim, Chad Keichler, also attended the party. Keichler saw Jennifer and told her she looked good. Jennifer responded by telling Keichler that [Schmitz] was her boyfriend, to which Keichler replied, "I don't give a fuck about your boyfriend." Later during the party, Keichler made some vulgar remarks to Jennifer which upset [Schmitz]. Keichler continued to make inappropriate remarks to other partygoers, further upsetting [Schmitz] and prompting him to leave the party and wait for

Jennifer in the car. [Schmitz] later returned to the party and said something to Jennifer about wanting to stab Keichler. Because [Schmitz] was "really angry," Jennifer decided it was time to go and she and [Schmitz] left the party.

In the weeks following the party, [Schmitz] continued to talk about the incident, repeating the same story over and over again and telling Jennifer he did not like Keichler.

Sometime after the party, Keichler's friend, Joseph, crossed paths with [Schmitz] at a bar. When Joseph said he knew Keichler, [Schmitz] said, "I want to kill that motherfucker when I see him." Joseph did not take the threat seriously, but later told Keichler what [Schmitz] said.

In October 2005, Keichler and some friends, including Allen W., were sitting at the Normal Street Bar having a drink. [Schmitz] was also sitting at the bar. At some point, Allen heard [Schmitz] say, "He's nothing but a bitch." Allen asked, "Excuse me? You talking to me?" and [Schmitz] replied, "If I was talking to you, I think you'd know it." A few minutes later, [Schmitz] walked over to Keichler, who was sitting further down the bar, and began an unfriendly "exchange of words" with him.

[Schmitz] and Keichler eventually walked outside the bar where the verbal exchange continued. Anthony M. followed them outside, as did Allen a few minutes later. Allen heard Keichler and Anthony arguing and "talking shit back and forth." Heather F., who was standing outside the bar with [Schmitz's] roommate, noticed [Schmitz], Keichler and Anthony in a heated conversation. Heather saw [Schmitz] say something in Keichler's ear and heard Keichler exclaim, "You're going to shoot me, mother———?" [Schmitz] left and Keichler, who was "extremely upset," said, "I just got my life threatened over a bunch of bullshit." Soon thereafter, a Durango pulled up to the corner and stopped. [Schmitz] got out, moved quickly to where Keichler was standing and shot him underneath his jaw with a small revolver. [Schmitz] then ran back to the Durango and sped away. Keichler was pronounced dead shortly after paramedics arrived.

*People v. Schmitz*, No. C061054, 2012 WL 3871361, at *1-2 (Cal. Ct. App. Sept. 7, 2012).

Based on a placement report, the court placed Schmitz at Napa State Hospital. Over a year later, upon reviewing a report from Napa State Hospital, the court found Schmitz competent and reinstated criminal proceedings. Schmitz subsequently pled no contest to counts 2 and 3. Schmitz then proceeded to trial before a jury on the murder charge (count 1). At the conclusion of trial, the jury found him guilty of the lesser included charge of second-degree murder and also found true the firearm allegations. The trial court sentenced Schmitz to an aggregate indeterminate term of 40 years to life imprisonment.

Through counsel, Schmitz appealed his conviction, arguing that: 1) the trial court erroneously instructed the jury regarding his mental defect or disorder by failing to alert the jury that it could consider evidence of his mental state on the issue of implied malice; 2) the trial court erred by instructing the jury that the firearm enhancement was a general intent, rather than specific intent, crime; 3) the jury returned an improper verdict as to the personal use of a firearm allegation; 4) the trial court improperly denied his request to instruct the jury on imperfect self-defense; and 5) the prosecution improperly questioned a defense expert regarding his compensation.  On September 7, 2012, the Court of Appeal issued a reasoned, unpublished opinion affirming the judgment against Schmitz in its entirety.  *Schmitz*, 2012 WL 3871361, at *9.  Again proceeding through counsel, Schmitz sought rehearing, which was summarily denied on September 18, 2012.  Schmitz also petitioned for review in the California Supreme Court, which was likewise denied without comment on December 19, 2012.  Schmitz also petitioned for a writ of certiorari from the United States Supreme Court, which was denied on May 20, 2013.

Proceeding through new counsel, Schmitz additionally filed in the California Superior Court a petition for a writ of habeas corpus, alleging that: 1) a juror held an impermissible bias against the mentally ill and committed misconduct by arguing to the remainder of the jury that the expert psychiatric testimony should be disregarded; 2) "some jurors" committed misconduct by contending that the jury could disregard an instruction that bore information showing that it had been submitted by the defense; 3) another juror committed misconduct by stopping the foreperson from reporting the jury's deadlock and insisting that the jury continue to deliberate; and 4) trial counsel was ineffective for failing to move earlier for Schmitz to have a cyst in his brain removed.  The Superior Court denied the petition in a reasoned order issued on September

3

5, 2013.  Schmitz then raised the same claims in a counseled habeas petition to the California

Court of Appeal, which was denied without comment on March 6, 2014.  He further raised the

claims in a petition for review to the California Supreme Court, which was summarily denied on

April 30, 2014.

While his petition for review was pending, Schmitz timely filed a counseled Petition for a

Writ of Habeas Corpus to this Court on March 11, 2014.  Schmitz subsequently filed an

Amended Petition (Docket No. 15), which is now ripe for consideration before the undersigned

judge.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Schmitz argues: 1) the trial court failed to

instruct the jury that Schmitz's mental disease could negate implied as well as express malice;

2) the trial court erroneously denied his request for an imperfect self-defense instruction; 3) the

jury's verdict did not support the intentional discharge of a firearm enhancement; 4) a juror held

an impermissible bias against the mentally ill and committed misconduct by urging other jurors

to disregard the defense's psychiatric expert testimony; 5) some jurors committed misconduct by

stating that they could disregard the defense's submitted instruction on voluntary manslaughter;

6) another juror committed misconduct by stopping the foreperson from reporting the jury's

deadlock; 7) trial counsel was ineffective for failing to move earlier to have a cyst removed from

Schmitz's brain; and 8) the existence of cumulative error warrants reversal of his conviction.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and

application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Here, the only decision on Simmons' collateral review claims was a summary denial by the California Supreme Court on habeas review, which is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.      <u>Instructional Errors</u> (Grounds One and Two)

Schmitz first argues that the trial court made two errors with respect to jury instructions. Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

1.    *Malice Instruction*

Schmitz first takes issue with the malice instruction given to the jury by arguing that it

failed to alert the jury that it could consider evidence of his mental state on the issue of implied

malice.  The Court of Appeal described the following facts underlying this claim:

> The defense presented at trial centered on [Schmitz's] claimed mental defect or
> disorder.  Defense expert Dr. Joseph Chong–Sang Wu testified that [Schmitz] had a "golf
> ball-sized cyst or lesion," otherwise known as an arachnoid cyst, on the temporal lobe of
> his brain.  According to Dr. Wu, the arachnoid cyst eroded bones in [Schmitz's] brain
> and compressed his temporal lobe, causing damage to his brain.  Dr. Wu opined that the
> damage caused by the arachnoid cyst compromised [Schmitz's] ability to control his
> aggressive impulses.
>     The jury was instructed with the following modified versions of two pinpoint
> instructions requested by [Schmitz]:
>
> **Pinpoint Instruction No. 3**
>     "You have received evidence regarding a mental defect or mental disorder of the
> defendant at the time of the commission of the crime charged in count one.  You may
> consider this evidence, separately or in combination with any evidence of the defendant's
> intoxication, for the purpose of determining whether or not the defendant actually
> premeditated and deliberated and harbored malice aforethought which are elements of the
> crime charged in count one."
>
> **Pinpoint Instruction No. 4**
>     "The prosecution must prove beyond a reasonable doubt that the defendant
> committed the charged crime with the required intent and/or mental state.  If, after
> considering all the circumstances, including the arachnoid cyst and the resulting
> symptoms suffered by defendant, you have a reasonable doubt about whether the
> defendant formed the required intent to kill, you must find him not guilty of first or
> second degree murder."

*Schmitz*, 2012 WL 3871361, at *2.

The Court of Appeal first found that review of this claim was precluded by the invited

error rule:

> [Schmitz] challenges the two instructions requested by defense counsel, who
> discussed with the court the defense theory—that [Schmitz]"killed, but [did so] because
> of his mental defect"—and argued the requested instructions properly included language
> that, in the absence of malice aforethought, a finding of a general "intent to kill" is still

required in order to find [Schmitz] guilty of voluntary manslaughter.  [Schmitz] concedes his attorney requested the instructions, and does not argue on appeal that counsel did so due to ignorance or mistake.  The record is clear that defense counsel had a deliberate tactical purpose in requesting the disputed instructions.  The error, if any, was invited by [Schmitz].

*Id.* at *3.

The Court of Appeal also rejected the claim on its merits, concluding that, " considering the instructions as a whole, we find the jury was correctly instructed on the law":

The jury was instructed, via the requested pinpoint instructions, to consider evidence of [Schmitz's] arachnoid cyst "for the purpose of determining whether or not the defendant actually . . . harbored *malice aforethought* . . .," and again "for the purpose of determining whether or not the defendant actually premeditated and deliberated and harbored *malice aforethought* which are elements of the crime charged in count one." (Italics added.)

The jury was also instructed regarding the difference between the two kinds of malice aforethought: express and implied malice (CALCRIM Nos. 520, 521), and the requirement that, in order to find [Schmitz] guilty of the specific intent crime of murder, they had to find that he "not only intentionally commit[ted] the prohibited act, but [he did so] with a specific intent and mental state."  (CALCRIM No. 252.)  The jury was further instructed with CALCRIM Nos. 521, 522 and 570 regarding the elements required to find defendant guilty of first degree murder, second degree murder, and voluntary manslaughter, as well as a modified version of CALCRIM No. 570 stating that, "Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter.  [¶]  There is no malice aforethought if the person did not harbor malice due to a mental disorder, mental defect or mental disease or due to voluntary intoxication, or both.  [¶]  In order to prove voluntary manslaughter, each of the following elements must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; [¶] 3. The killing was done with the intent to kill."  The court also instructed the jury that, "[w]hen a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter . . . . " (CALCRIM No. 580.)  These instructions, considered collectively, relate evidence of [Schmitz's] arachnoid cyst to the element of malice, both express and implied, and to the evidence necessary to convict [Schmitz] of the charged crime.

[Schmitz] contends the jury was instructed to consider evidence of his arachnoid cyst with respect to whether he "formed the intent to kill" despite the fact that implied malice murder does not require an intent to kill.  But this very issue was discussed at trial, at which time defense counsel argued successfully that the requested instruction include language requiring a finding of a general "intent to kill" even for the lesser offense of voluntary manslaughter.

9

We conclude defense counsel invited the error, if there was any.  In any event, the jury was properly instructed.

*Id.* at *3-4.

Respondent argues that Schmitz's claim is procedurally barred because the Court of Appeal found his claim precluded by the invited error doctrine.  Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims." *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992).  The Ninth Circuit has recognized that where a state court applied the doctrine of invited error to bar a claim, a federal habeas court may find the claim procedurally barred. *See Leavitt v. Arave,* 383 F.3d 809, 832-33 (9th Cir. 2004) ("There is no reason that we should treat the invited error rule differently from other state procedural bars.").  In this case, Schmitz not only failed to object to the jury instruction, but in fact requested it.  Because the trial court issued the requested instruction, Schmitz is not now entitled to claim that the issuance of the instruction was error.

Schmitz argues that the error was not invited by relying on California case law indicating that a finding of invited error requires evidence that counsel had a tactical purpose in his or her actions later asserted to be error.  Because he claims that counsel could have no tactical reason for allowing the alleged mistake, Schmitz asserts that the error was not invited and thus his claim is not procedurally barred here.  But state case law is insufficient to preserve review of the claim here.  Under federal law, a petitioner may show cause for a procedural default by establishing constitutionally ineffective assistance of counsel.  But attorney error short of constitutionally

ineffective assistance of counsel does not constitute cause and will not excuse a procedural

default.  *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

Moreover, even if the claim were properly before this Court for its review, the Court

must deny it.  For the reasons persuasively supplied by the Court of Appeal, Schmitz fails to

show that the challenged instruction was error.  Schmitz thus cannot prevail on this instructional

error claim in any event.

2.    *Imperfect Self-Defense Instruction*

Schmitz also contends that the trial court erred when it denied his request to instruct the

jury on imperfect self-defense, which would have reduced his culpability to voluntary

manslaughter.  As the Court of Appeal explained:

> A trial court must instruct, sua sponte, "on all theories of a lesser included offense
> which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal. 4th
> 142, 162.)  However, where " 'there is no evidence that the offense was less than that
> charged,' " there is no such duty to instruct.  (*People v. Barton*, supra, 12 Cal. 4th at p.
> 196, fn. 5.)
>
> "For killing to be in self-defense, the defendant must actually and reasonably
> believe in the need to defend.  [Citation.]  If the belief subjectively exists but is
> objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed
> to have acted without malice and cannot be convicted of murder,' but can be convicted of
> manslaughter.  [Citation.]  To constitute 'perfect self-defense,' i.e., to exonerate the
> person completely, the belief must also be objectively reasonable.  [Citations.] . . . [F]or
> either perfect or imperfect self-defense, the fear must be of imminent harm.  'Fear of
> future harm—no matter how great the fear and no matter how great the likelihood of the
> harm—will not suffice.  The defendant's fear must be of imminent danger to life or great
> bodily injury.'  [Citation.]"  (*People v. Humphrey* (1996) 13 Cal. 4th 1073, 1082, fn. and
> italics omitted.)  All the surrounding circumstances, including prior assaults and threats,
> may be considered in determining whether the accused perceived an imminent threat of
> death or great bodily injury.  (*Id*. at p. 1083; *see also People v. Michaels* (2002) 28 Cal.
> 4th 486, 530–531.)  "[B]oth self-defense and defense of others, whether perfect or
> imperfect, require an actual fear of imminent harm.  [Citation.]"  (*People v. Butler* (2009)
> 46 Cal. 4th 847, 868.)
>
> "This definition of imminence reflects the great value our society places on
> human life.  The criminal law would not sentence to death a person such as the victim in
> this case for a murder he merely threatened to commit, even if he had committed

threatened murders many times in the past and had threatened to murder the defendant; it follows that the criminal law will not even partially excuse a potential victim's slaying of his attacker unless more than merely threats and a history of past assaults is involved." (*People v. Aris* (1989) 215 Cal. App. 3d 1178, 1189, *overruled on another ground in People v. Humphrey*, *supra*, 13 Cal. 4th at p. 1089.)

*Schmitz*, 2012 WL 3871361, at *6-7.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). Accordingly, the decision of the California courts denying Schmitz relief as to this claim was not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has recognized that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent. *Solis*, 219 F.3d at 929. Although Schmitz argues here that there was evidence supporting a voluntary manslaughter instruction, as the Court of Appeal reasonably

concluded based on its review of the record, the evidence presented at trial simply did not

support a defense that Schmitz committed the offense out of provocation or heat of passion:

> Here, the evidence was not sufficient to support giving an instruction on imperfect self-defense. [Schmitz] argues Keichler's "threatening words and attitude" were sufficient to trigger his response of imperfect self-defense. As "ample evidence of a threat of imminent attack from Chad Keichler," [Schmitz] states that "Keichler was drunk, loud and threatening at a party months prior to the homicide"; Keichler had a blood alcohol level of 0.36 percent and had cocaine in his system at the time of his death; Keichler had a prior conviction for "assault as a felony hate crime"; [Schmitz] and Keichler exchanged "angry words" in the bar prior to the shooting; the verbal confrontation between [Schmitz] and Keichler continued as they both exited the bar; "people in the crowd" pleaded with Keichler to leave; once in the street, Keichler "raised his voice"; Keichler and Anthony M. "addressed each other in loud, 'macho' or 'tough guy' talk" outside the bar; Keichler said, "I could fight all you guys"; and when the bartender intervened and tried to escort Keichler from the scene, Keichler "continued to yell at the crowd."

> Neither the evidence offered, nor the record, demonstrate that [Schmitz] shot and killed Keichler in response to a subjective fear of imminent harm. Instead, the evidence shows that Keichler angered [Schmitz] at a party months before the shooting, and that [Schmitz] repeatedly talked about those events as his anger continued to fester until that fateful day when he and Keichler once again found themselves in the same bar.

> [Schmitz] asserts "there was a distinct possibility of a physical attack by Keichler." The record does not bear that out. While Keichler was intoxicated and had cocaine in his system at the time of the shooting, at most he exchanged angry words with defendant inside and outside the bar, yelled at Anthony and the gathering crowd, and boasted that he could "fight all you guys." Heather testified that although Keichler was "getting in [Schmitz's] face," there was "no shoving" and no physical contact between Keichler and [Schmitz] or anyone during the argument that preceded the shooting. [Schmitz] provides no evidence that Keichler verbally or physically threatened him.

> While [Schmitz] characterizes Keichler's vulgar remarks to Jennifer at the party months prior to the shooting as "loud and threatening," it was [Schmitz] who became angry and said he wanted to stab Keichler at the party, and who later told Joseph he wanted to "kill that motherfucker." On the day of the shooting, it was [Schmitz] who was the instigator, telling a friend that Keichler was "nothing but a bitch" and then approaching Keichler and initiating a heated verbal exchange. Once the argument moved outside the bar, it was [Schmitz] who quietly said something close to Keichler's ear, causing Keichler to respond, "You're going to shoot me, mother——?" and exclaim, "I just got my life threatened over a bunch of bullshit." It was [Schmitz] who, after leaving the bar, returned and shot Keichler in the neck. [Schmitz] notes Keichler's prior conviction for "a felony hate crime," but does not claim to have known about it prior to the shooting, nor does he claim Keichler ever actually threatened to hurt or kill him.

13

> After the shooting, [Schmitz] told Jennifer he "shot that motherfucker," but gave no indication whatsoever that he did so out of fear of imminent danger.
>
> In the absence of any evidence that [Schmitz] actually feared imminent harm, reasonable or otherwise, the trial court had no duty to instruct on the theory of imperfect self-defense.  There was no instructional error.

*Schmitz*, 2012 WL 3871361, at *7-8.

The state court's conclusion that there was no substantial evidence to support an imperfect self-defense instruction was a reasonable one.  Schmitz argues here that the Court of Appeal failed to consider his mental defect in determining whether he held a subjective belief that he faced imminent harm.  Under California law, "substantial evidence" is defined as evidence that "a reasonable jury could find persuasive," which is distinct from *any* evidence. *People v. Breverman*, 960 P.2d 1094, 1106 (Cal. 1998).  Even if this Court were to find Schmitz's statement that his mental defect sufficed as "substantial evidence" of his subjective belief of his imminent danger, it still would not overcome AEDPA deference to warrant habeas relief.  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Because Schmitz was not entitled to the instruction under state law, the trial court's failure to give it was not error and did not deprive petitioner of a fair trial. Accordingly, Schmitz is not entitled to relief on this instructional error claim either.

B.     <u>Improper Verdict</u> (Ground Three)

Schmitz next argues that his due process rights were violated "when he was convicted and sentenced for intentionally discharging a firearm when the jury only found he 'used' a firearm."  The record reflects that, at the conclusion of trial, the jury returned a verdict form entitled "Finding, Special Allegation Personal Use of a Firearm Count 1," which read: "We, the jury in the above-entitled matter, having found [Schmitz] . . . guilty of the crime of 2nd Degree Murder . . . as alleged in Count 1, find the Special Allegation that [Schmitz] personally used a firearm, in violation of Penal Code sections 12022.53(b), 12022.53(c), and 12022.53(d): [¶] . . . True."  Schmitz argues, as he did on direct appeal that a true finding of firearm "use," as stated in Penal Code § 12022.53(b), is a "distinct and lesser enhancement allegation" that is insufficient to support an allegation of firearm "discharge," as required by Penal Code section 12022.53, subdivision (c) and (d).  The Court of Appeal construed his argument as a challenge to the verdict form itself because it omitted mention of discharge.  *Schmitz*, 2012 WL 3871361, at *5. It rejected such claim due to a failure to object at trial and alternatively rejected it on the merits. *Id.*

As an initial matter, because the state appellate court found Schmitz's claim forfeited under California's contemporaneous objection rule, to the extent the claim raised in his Petition reasserts the verdict form claim addressed by the Court of Appeal, it is procedurally defaulted from federal habeas review.  *Coleman*, 501 U.S. at 729-30 (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment); *cf. Ayuyu v. Tagabuel*, 284 F.3d 1023, 1026 (9th Cir.2002) (finding in federal civil suit that claim based on an improper verdict

form is waived if no objection to the form of the verdict was made in the record or in the motion

for new trial).  The Ninth Circuit has repeatedly recognized and applied the California

contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of

procedural default where there was a complete failure to object at trial.  *See, e.g.*, *Inthavong v.*

*Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th

Cir. 2004).

      In his Petition before this Court, Schmitz more clearly raises a claim under *Apprendi v.*

*New Jersey*, 530 U.S. 466, 490 (2000), which provides that, "[o]ther than the fact of a prior

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Schmitz argues

that, because the verdict form did not explicitly indicate that the jury found beyond a reasonable

doubt that Schmitz discharged a firearm, his conviction on the firearm enhancement was in

violation of *Apprendi*.  But although the Court of Appeal did not specifically cite *Apprendi*, it

nonetheless concluded that *Apprendi* did not apply here because Schmitz was not deprived of his

right to have a jury determine each and every allegation against him beyond a reasonable doubt:

> [T]he information alleged violations of Penal Code section 12022.53,
> subdivisions (b) [personal use of a firearm], (c) [personal and intentional discharge of a
> firearm], and (d) [personal and intentional discharge of a firearm causing great bodily
> injury and death].  That information was read to the jury.  The court instructed the jury
> with CALCRIM No. 3149, entitled "Personally Used Firearm: Intentional Discharge
> Causing Injury or Death (Pen. Code, §§ 667.61(e)(3), 12022.53(d))," and CALCRIM No.
> 3146. CALCRIM No. 3149 begins, "If you find the defendant guilty of the crime charged
> in Count 1, First Degree [M]urder, or the lesser crime of Second Degree Murder, you
> must then decide whether the People have proved the additional allegation that the
> defendant *personally and intentionally discharged a firearm* during that crime causing
> death."  (Italics added.)  In contrast, CALCRIM No. 3146 begins, "If you find the
> defendant guilty of a lesser crime charged in Count 1, either Voluntary Manslaughter or
> Involuntary Manslaughter, you must then decide whether the People have proved the

additional allegation that the defendant *personally used a firearm* during the commission of that crime." (Italics added.)

A verdict form is to be read in combination with the charging instrument, the plea entered, and the trial court's instructions. (*People v. Paul* (1998) 18 Cal. 4th 698, 706; *People v. Jones*, supra, 58 Cal. App. 4th at p. 710.) Unless connected to an information, verdict forms are ordinarily without meaning. (*Paul*, at pp. 706–707.) Furthermore, "the form of the verdict generally is immaterial, so long as the intention of the jury to convict clearly may be seen." (*Id.* p. 707.)

Here, the jury's intent was clear. The jury returned a verdict of guilty on the lesser charge of second degree murder. Consistent with that verdict, and in keeping with the instruction given in CALCRIM No. 3149, the jury found true the allegation that, in committing the murder, [Schmitz] "used a firearm, in violation of Penal Code sections 12022.53(b), 12022.53(c), and 12022.53(d)." In other words, the jury found [Schmitz] used a firearm in a manner that violated each of the three subdivisions, including subdivision (d) which requires that the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death."

*Schmitz*, 2012 WL 3871361, at *5-6.

This Court's independent reading of the record comports with that of the Court of Appeal. As discussed, the information charged Schmitz with personally discharging a firearm, and the trial court correctly instructed the jury that it had to find that Schmitz personally discharged the firearm in order to find true the enhancement allegation against him. Thus, as the Court of Appeal reasonably concluded:

[T]he recitation of the information, the trial court's instructions, and the verdict form's reference to each of the three relevant Penal Code sections properly placed [Schmitz's] guilt on all elements of the enhancement before the jury. Accordingly, the jury's clear intent to find [Schmitz] personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury and death was demonstrated through the verdict.

*Id.* at *6.

Schmitz's reliance on *Apprendi* is thus unavailing, and he is not entitled to federal habeas relief on this claim either.

C.    Juror Bias/Misconduct (Grounds Four, Five, and Six)

17

Schmitz next raises a number of claims related to the sitting jurors.  Schmitz raised these claims to the state courts by way of habeas petition, the majority of which were denied with a notation that, even if the allegations were true, Schmitz would not be entitled to relief.  A final claim, relating to whether the jurors followed instructions submitted by the defense, was denied because Schmitz did not show prejudice from the alleged conduct.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  While "[d]oubts regarding bias must be resolved against the juror," *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004), a defendant "bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause," *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks and alteration omitted).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

Similarly, due process requires that a criminal defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court.").  The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966).  Habeas relief is warranted, however, only where it is

reasonably likely that the petitioner would have obtained a better outcome if the misconduct had

not occurred.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (constitutional trial errors do

not warrant habeas relief unless they have substantial and injurious impact on the jury's verdict

or trial proceedings).  The following factors are relevant to determining whether the alleged

introduction of extrinsic evidence constitutes reversible error: (1) whether the extrinsic material

was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the

extent to which the jury discussed and considered it; (4) whether the material was introduced

before a verdict was reached, and if so, at what point in the deliberations it was introduced; and

(5) any other matters which may bear on the issue of whether the introduction of extrinsic

material substantially and injuriously affected the verdict.  *Estrada*, 512 F.3d at 1238; *see also*

*Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000).

      1.    *Bias*

      Schmitz first contends that he was subjected to an impartial jury because one of the

jurors, referred to as Juror J, "held an impermissible bias against the mentally ill and the validity

of psychiatric testimony" and "committed misconduct when he argued the expert psychiatric

testimony should be disregarded based on the juror's purportedly 'expert' opinion that people lie

about mental illness to get out of trouble and that mentally ill people are manipulative."

      In support of his claim that Juror J was biased against him, Schmitz attached to his state

court habeas petition 3 juror declarations detailing other jurors' assessments of Juror J.  But in

determining whether a defendant was convicted by a fair and impartial jury, Federal Rule of

Evidence 606(b) limits a federal court's consideration of potential jury misconduct.[1]   That rule

provides:

> During an inquiry into the validity of a verdict or indictment, a juror may not
> testify about any statement made or incident that occurred during the jury's deliberations;
> the effect of anything on that juror's or another juror's vote; or any juror's mental
> processes concerning the verdict or indictment.   The court may not receive a juror's
> affidavit or evidence of a juror's statement on these matters.

FED. R. EVID. 606(b).[2]

In accordance with this rule, federal courts routinely deny motions for a new trial where

such requests are based on juror declarations deemed inadmissible under Rule 606(b).  *See, e.g.*,

*United States v. Bussell*, 414 F.3d 1048, 1054-55 (9th Cir. 2005) (agreeing with district court that

juror declaration regarding juror speculation that co-defendant had pled guilty were inadmissible

under Rule 606(b) and that, therefore, no evidentiary hearing or new trial was warranted); *United

States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004) (upholding district court's denial of new

trial because Rule 606(b) barred consideration of declarations stating that jurors ignored court's

instructions and discussed defendant's failure to testify).

Rule 606(b) also "applies to petitions for habeas corpus from state court prisoners."

*Erikson v. Rowland*, 991 F.2d 803, at *2 (9th Cir. 1993) (unpublished).   Thus, federal courts

---

[1]   The rationale for this rule is the protection of jury verdicts which "can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.   Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict."  *Tanner v. United States*, 483 U.S. 107, 119-20 (1987) (citations omitted).

[2]   The rule applies an "[e]xception[] . . . for testimony as to 'extraneous prejudicial information' brought to the attention of the jury, an improper 'outside influence' on a juror, or a mistake in completing a jury form."  FED. R. EVID. 606(b).  Because there was no extraneous information, this exception is inapplicable here.

have likewise consistently rejected habeas claims alleging juror bias or misconduct where those claims depend on evidence that would be inadmissible under Rule 606(b). *See, e.g.*, *id.* at *3; *Harrison v. Gillespie*, 640 F.3d 888, 895 (9th Cir. 2011) (noting, in context of a § 2241 habeas petition, that a Court "may not consider jurors' testimony addressing the jury's deliberative process unless the testimony 'bear[s] on extraneous influences on the deliberation'"); *Estrada*, 512 F.3d at 1237-38 (9th Cir. 2008) (affirming district court's application of Rule 606(b) to bar consideration of certain juror affidavits supporting a § 2254 habeas petitioner's juror misconduct claim). Because Schmitz has not presented admissible evidence of the alleged juror misconduct during deliberations, and, indeed, will necessarily be unable to do so given the nature of the alleged misconduct, this claim must also fail on federal habeas review. Further, even if Schmitz were able to present admissible evidence, "allegations that relate to 'intrinsic jury processes' do not implicate the protections of the Sixth Amendment." *See Hernandez v. Barnes*, No. CV 12-01887, 2015 WL 269050, at *9 (C.D. Cal. Jan. 20, 2015) (citing *United States v. Bagnariol*, 665 F.2d 877, 887 (9th Cir. 1981) ("Intrinsic jury processes will not be examined on appeal and cannot support reversal.")).

2.    *Misconduct*

Schmitz also contends that Juror J additionally committed misconduct by "improperly express[ing] his biased 'expert' opinion about mentally ill people during deliberations." Likewise, he claims that "misconduct occurred when jurors said they could disregard the defense instruction" outlining Schmitz's mental defect defense. He also alleges that Juror R committed misconduct when he stopped the foreperson from reporting the jury's deadlock and instead encouraged the jury to continue deliberations. But none of these misconduct claims warrant

relief either because, again, the declaration evidence he provides in support of these claims is barred by Rule 606(b).[3]

Schmitz further seeks an evidentiary hearing as to these claims, but Rule 606(b) also precludes this Court from questioning jurors as to the internal mental processes by which the verdict was rendered. *See, e.g.*, *United States v. Bussell*, 414 F.3d 1048, 1054-55 (9th Cir. 2005) (agreeing with district court that juror declaration regarding juror speculation that co-defendant had pled guilty were inadmissible under Rule 606(b) and that, therefore, no evidentiary hearing or new trial was warranted). Accordingly, Schmitz is not entitled to any type of relief on his juror bias and misconduct claims.

---

[3] Moreover, Schmitz cannot show that Juror J or Juror R committed misconduct in these respects. It is true that a juror's statements or opinions on a case to fellow jurors may, in certain very limited circumstances, be found to taint the verdict and deprive a defendant of his right to an unbiased jury. *See Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1997) (granting habeas relief where a juror stated in the presence of other jurors during voir dire in a pre-AEDPA case charging the defendant with sexual contact with a minor that she had worked for three years as a child protective services worker, had expertise in the area of child sexual abuse and that she had never been involved in a case in which the child's claim of sexual abuse had not been borne out). But the challenged statements of Juror J did not constitute juror misconduct since a "'juror's past personal experiences may be an appropriate part of the jury's deliberations.'" *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir. 2004) (citation omitted); *United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012); *see also Hard v. Burlington N .R .R.*, 812 F.2d 482, 486 (9th Cir. 1987) ("Jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict."); *Rucker v. Lattimore*, 369 F. App'x 810, 813 (9th Cir. 2010) ("The district court did not err in rejecting Rucker's claim that her constitutional rights were violated when during jury deliberation jurors nine and two discussed their personal experiences as victims of sexual assault" because "'[a] juror's past personal experiences may be an appropriate part of the jury's deliberations.'" (citation omitted)). Additionally, given the importance of reaching a unanimous verdict, it cannot be said that Juror R's alleged statements encouraging the jurors to continue deliberations was misconduct. Indeed, if the foreperson had reported the deadlock, it would have been constitutionally acceptable for the trial court to issue what is known as an *Allen* charge, *see Allen v. United States*, 164 U.S. 492 (1896), which "is traditionally understood as 'an instruction to consider the point of view of others' when the jury has reached an impasse in its deliberations," *United States v. Wills*, 88 F.3d 704, 716 (9th Cir. 1996) (internal citations omitted).

D.   <u>Ineffective Assistance of Trial Counsel</u> (Ground Seven)

Schmitz also faults trial counsel for not earlier moving for an order that Schmitz receive surgery to remove an arachnoid cyst.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Schmitz must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

The record indicates that, on the eve of trial, defense counsel filed a pre-trial motion seeking an order that Schmitz receive the surgery prior to trial.  The motion indicated that a doctor had discovered the cyst in 2004 but had deemed surgery medically unnecessary. According to the motion, however, a consulting neurosurgeon subsequently determined that the surgery was "medically necessary," and experts concluded that the cyst affected Schmitz's behavior, that Schmitz took medication to regulate that behavior, and that it was probable that surgery would eliminate the need for the medication and allow Schmitz to present a better image at trial.  The court also heard oral argument at the motion, in which the defense conceded that there was no emergency medical need for surgery.  The prosecution did not dispute the cyst's existence but summarily opposed the motion.  The court then ruled:

> The matter's been submitted.  Just to make a record, we had a prehearing, pretrial meeting on Wednesday.  This motion was not made at that time.  The matter's been before the Court now for several years and at no time has a motion been made for surgery until the morning of trial.
> The Court does not have a medical opinion, of course, as to whether Mr. Schmitz needs to have a tumor removed.
> I don't have any medical information right now that he has a tumor.  Although I did read Dr. Ford's report [from Schmitz's earlier competency proceedings], and he indicates there was a tumor . . . but that [there] would not be an effect on his trial.
> Without more, I'm going to deny the motion.

24

In his habeas petition to the state superior court, Schmitz alleged that counsel was ineffective for not filing the motion earlier and that, if he had, it was likely that the motion would have been granted, and there was a "strong possibility" that removal of the cyst would have altered Schmitz's behavior at trial and proved that his "violent, impulsive behavior" was a product of the cyst.  The superior court considered and rejected the claim as follows:

> It is claimed that [the surgical procedure] would have alleviated [Schmitz's] psychiatric symptoms and established that the killing was a result of those symptoms rather than malice.
> The court believes that this analysis is speculative.  No post-trial information has been brought forward to show [Schmitz's] current situation, whether the psychiatric symptoms have been alleviated or have persisted, or even whether the surgery has ever been accomplished.

Schmitz fares no better on federal habeas review.  This Court agrees with the state court that this claim is far too speculative to warrant relief under the stringent guidelines enumerated above.  Schmitz has provided insufficient evidence to reasonably believe that the jury would have rendered a different verdict had the surgery been performed prior to trial.  He points to the opinions of Dr. Tucker, who testified that surgery is successful in 80% of cases at curing or significantly reducing these psychiatric symptoms, and Dr. Wu, who opined that the "vast majority" of patients who have these cysts removed see a reversal in their psychoses, mood, and cognitive problems.  But Schmitz's claim relies on an assumption that: a) the motion would have been granted; b) the surgery would have been successful; c) the surgery would have altered Schmitz's behavior and psychiatric symptoms; and d) the jury would have believed that Schmitz's actions during the incident were induced by psychiatric problems related to the cyst.  Simply put, the evidence proffered fails to make the large leap required to demonstrate these facts.  *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (granting habeas relief "on

the basis of little more than speculation with slight support" is improper).  Notably, the

testimony of Dr. Tucker and Dr. Wu regarding the existence of the cyst and its alleged effect on

Schmitz's behavior was before the jury for its assessment.  The jury's verdict, in the face of the

defense experts' testimony, indicates that the jury did not believe that Schmitz's cyst-related

psychiatric symptoms alleviated his culpability.  Accordingly, Schmitz is not entitled to relief on

his ineffective assistance claim.

E.       Cumulative Error (Ground Eight)

Schmitz additionally alleges that the cumulative effect of the alleged errors he identifies

in Grounds One through Seven warrant reversal of his conviction.  He raised this claim in his

state habeas petition to the California Superior Court, which was denied without specific

mention of this claim.

"While the combined effect of multiple errors may violate due process even when no

single error amounts to a constitutional violation or requires reversal, habeas relief is warranted

only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th

Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection"

occurs where the combined effect of the errors had a "substantial and injurious effect or

influence  in determining the jury's verdict."  *Brecht*, 507 U.S. at 623 (citation omitted).  In other

words, where the combined effect of individually harmless errors renders a criminal defense "far

less persuasive than it might [otherwise] have been," the resulting conviction violates due

process.  *See Chambers*, 401 U.S. at 294.  As discussed above, however, Schmitz does not allege

any claims that amount to error, and thus he demonstrates no errors that can accumulate to a

level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

Accordingly, Schmitz is not entitled to relief on his cumulative error claim.

F.       Other Requested Relief

In his prayer for relief, Schmitz further requests various forms of additional relief.  Two

of these requests have already been granted in this action, as Respondent has been ordered and

has completed its Answer in this case and has supplied the Court for its review the entire state

court record in the underlying action.

Schmitz also seeks an evidentiary hearing, discovery, authority to obtain without cost

subpoenas for witnesses and documents, and an opportunity to amend his Petition, if necessary.

But as thoroughly discussed above, Schmitz fails to bring any colorable claims, and an

opportunity to amend or supplement his Petition would not save it.  Accordingly, the Court also

denies these other forms of relief.

V. CONCLUSION AND ORDER

Schmitz is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254

for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** all other requests for relief are **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 13, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge